## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

**DEFY VENTURES, INC.**, 3550 Wilshire Blvd., Ste 1550, Los Angeles, CA, 90010;

**SEKWAN MERRITT**, 2123 Brigadiere Blvd, Odenton, MD, 21113, Anne Arundel County;

**PROP PREP PROPERTIES, LLC d/b/a LIGHTNING ELECTRIC**, 3520 Ailsa Avenue, Baltimore, MD, 21214, Baltimore County;

**JOHN D. GARLAND**, 218-32 99th Ave, Queens Village, NY, 11429;

**SIGN ME UP BETHPAGE, INC. d/b/a FASTSIGNS 2323**, 392 North Wantagh Avenue, Bethpage, NY, 11714,

**Civil Action No.**

$\qquad$ **Plaintiffs,**

v.

**UNITED STATES SMALL BUSINESS ADMINISTRATION**, 409 3rd St., SW, Washington, DC, 20416;

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**JOVITA CARRANZA**, *in her official capacity as Administrator*, U.S. Small Business Administration, 409 3rd St., SW, Washington, DC, 20416;

**UNITED STATES DEPARTMENT OF THE TREASURY**, 1500 Pennsylvania Ave., NW, Washington, DC, 20220;

**STEVEN MNUCHIN**, *in his official capacity as Secretary*, U.S. Department of the Treasury, 1500 Pennsylvania Ave., NW, Washington, DC, 20220**,**

$\qquad$ **Defendants.**

## INTRODUCTION

1.      In the first quarter of 2020, the United States economy suffered its most severe contraction in more than a decade. As the threat of the novel coronavirus mushroomed into the country's gravest public health crisis in a century, businesses were forced to shutter.

2.      Small-business owners, in particular, faced a dire struggle for survival. According to federal data, between February and April, the total number of active business owners plummeted by 22%,[1] the "largest drop on record."[2] By comparison, from the start to end of the Great Recession, the number of business owners decreased by 730,000—only a 5% reduction.[3]

3.      The shutdowns hit business owners of color especially hard: 41% of African-American-owned businesses and 32% of Latinx-owned businesses disappeared between February and April 2020 alone.[4]

4.      The cascading waves of closures and layoffs caused the national unemployment rate to soar to 14.7% in April, its highest peak since the Great

---

[1] Hannah Knowles, *Number of Working Black Business Owners Falls 40 Percent, Far More Than Other Groups Amid Coronavirus*, Wash. Post (May 25, 2020), https://www.washingtonpost.com/business/2020/05/25/black-minority-business-owners-coronavirus/.

[2] Robert W. Fairlie, *The Impact of Covid-19 on Small Business Owners: Evidence of Early-Stage Losses from the April 2020 Current Population Survey* 1 (Nat'l Bureau Econ. Research, Working Paper No. 27309 (June 2020) (analyzing data from the Bureau of Labor Statistics Current Population Survey).

[3] *Id.* at 8-9.

[4] *Id.*

Depression.[5] Analyses noted that, even for the businesses able to remain afloat in May, thirty million small-business jobs remained vulnerable to layoff or furlough.[6]

5.      In the midst of the fallout, Congress stepped in to keep the economy on life support. The CARES Act was enacted on March 27, 2020. The Act, in part, created a $669 billion small business grant program called the Paycheck Protection Program (the "PPP").

6.      Congress established the PPP to help all eligible businesses and other entities, including sole proprietorships and nonprofits, continue to pay their workers.

7.      The CARES Act expressly provides that "any" business that satisfies the specified eligibility criteria relating to size "shall" be eligible for relief under the PPP. 15 U.S.C. § 636(a)(36)(D).

8.      However, the Small Business Administration ("SBA"), the agency responsible for administering the program, thereafter created exclusions that bar a broad swath of small-business owners with a history of involvement in the criminal-legal system from PPP funds (the "criminal-record exclusions"). The SBA has continued to shift the terms of the criminal-record exclusions through various, inconsistent policy documents. But throughout it all, the SBA has excluded from the

---

[5] Catherine Thorbecke, *US Unemployment Rate Skyrockets to 14.7%, the Worst Since the Great Depression*, ABC News (May 8, 2020), https://abcnews.go.com/Business/us-economy-lost-205-million-jobs-april-unemployment/story?id=70558779.

[6] André Dua et al., *COVID-19's Effect on Jobs at Small Businesses in the United States*, McKinsey & Co. (May 5, 2020), https://www.mckinsey.com/industries/social-sector/our-insights/covid-19s-effect-on-jobs-at-small-businesses-in-the-united-states#.

PPP's promised relief small-business owners who have had past interactions with the criminal-legal system, as well as those they employ. The SBA has not explained why.

9.    The criminal-record exclusions are inconsistent with the text and purpose of the CARES Act. They tell a sweeping category of small-business owners across the country that, at a time of acute financial fragility, there is no lifeline for them or their employees.

10.    The criminal-record exclusions unlawfully and arbitrarily increase the already considerable barriers to economic success faced by the 1 in 3 working-age Americans with criminal records.[7] The criminal-record exclusions also harm all Americans who happen to work for a small business whose owner has a covered criminal record.

11.    Even in a booming economy, people with criminal records experience unemployment at nearly five times the average rate.[8] Defying the odds already stacked against them, many start their own small businesses because they are unable to obtain traditional employment, and in turn create jobs for other people with criminal records who have historically been excluded from the workforce.[9] In the

---

[7] Bureau of Justice Statistics, U.S. Dep't of Justice, *Survey of State Criminal History Information Systems, 2012* (2014), https://www.ncjrs.gov/pdffiles1/bjs/grants/244563.pdf.

[8] Lucius Couloute & Daniel Kopf, *Out of Prison & Out of Work: Unemployment Among Formerly Incarcerated People*, Prison Pol'y Initiative (July 2018), https://www.prisonpolicy.org/reports/outofwork.html.

[9] *See generally* Joyce Klein & Lavanya Mohan, *Prison to Proprietor: Entrepreneurship as a Re-Entry Strategy*, Aspen Inst. (2016), https://assets.aspeninstitute.org/content/uploads/2016/09/AFN-PrisonToProprietor.pdf?_ga=2.13870965.336196160.1587652799-828052410.1587652799; Nicole Lindahl and Debbie A. Mukamal, *Venturing Beyond the Gates: Facilitating Successful Reentry with*

current economic climate, these individuals and their communities face financial devastation.

12.   The SBA's criminal-record exclusions have also exacerbated the pandemic's disproportionate health and economic impacts on communities of color. Due to systemic racism in the criminal-legal system, the criminal-record exclusions fall hardest on minority business owners and workers. Black Americans are 3.6 times more likely than white people to be arrested for marijuana, despite similar usage rates.[10]  Black Americans are incarcerated at more than five times the rate of white people;[11] one-third of Black American men have a felony conviction.[12] Data suggest that of all U.S. business owners, 2% of white business owners, 15% of Black business owners, and 10% of Latinx business owners have been incarcerated at some point in their lives. *See* Exhibit D (Decl. of Dr. Christopher Wildeman) ¶ 1.

13.   The SBA's criminal-record exclusions violate the Administrative Procedure Act ("APA") because they impose additional eligibility requirements for PPP funds contrary to the CARES Act.

---

*Entrepreneurship*, Prisoner Reentry Institute, John Jay College of Criminal Justice (2007), https://files.eric.ed.gov/fulltext/ED540831.pdf.

[10] Ezekiel Edwards et al., *A Tale of Two Countries: Racially Targeted Arrests in the Era of Marijuana Reform* at 29, ACLU (2020), https://www.aclu.org/report/tale-two-countries-racially-targeted-arrests-era-marijuana-reform.

[11] *Criminal Justice Fact Sheet*, NAACP, https://www.naacp.org/criminal-justice-fact-sheet/ (last visited June 15, 2020).

[12] *Race & Justice News: One-Third of Black Men Have Felony Convictions*, Sentencing Project (Oct. 10, 2017), https://www.sentencingproject.org/news/5593/.

14.     The criminal-record exclusions also violate the APA because they are arbitrary and capricious. The SBA has repeatedly changed the scope of the criminal-record exclusions without explanation or notice. These constant shifts and inconsistencies in criteria have altered the eligibility of business owners as the deadline draws near, depriving them of the opportunity to apply for loans.

15.     The criminal-record exclusions cause irreparable harm to Plaintiffs and similarly situated business owners, businesses, and the organizations that devote resources to funding and advising them. As Congress's passage of the PPP reflects, *all* small-business owners urgently need relief right now to keep their businesses afloat and to continue paying their workers.

16.     This lawsuit asks the Court to declare unlawful and set aside Defendants' criminal-record exclusions, and to enjoin the Defendants from continuing to bar PPP applicants with criminal records from the critical federal aid that Congress promised.

**PARTIES**

17.     Plaintiff Sekwan Merritt, a resident of Maryland, is the sole owner of Prop Prep Properties LLC, an electrical contracting company doing business as Lightning Electric. He resides at 2123 Brigadiere Boulevard, Odenton, Maryland, 21113, Anne Arundel County.

18.     Plaintiff Prop Prep Properties LLC, doing business as Lightning Electric ("Lightning Electric"), is a limited liability company duly organized and authorized to conduct business in the State of Maryland. Lightning Electric does business at 3520 Ailsa Avenue, Baltimore, Maryland, 21214.

19.     Plaintiff John D. Garland, a resident of New York, is the majority owner of Sign Me Up Bethpage, Inc., doing business as Fastsigns 2323. He resides at 218-32 99th Avenue, Queens Village, New York, 11429.

20.     Plaintiff Sign Me Up Bethpage, Inc., doing business as Fastsigns 2323 ("Fastsigns Bethpage"), is a domestic business corporation duly organized and authorized to conduct business in the State of New York. Fastsigns Bethpage does business at 392 North Wantagh Avenue, Bethpage, New York, 11714.

21.     Plaintiff Defy Ventures, Inc. ("Defy") is a nonprofit organization incorporated in New York, with its main office located at 3550 Wilshire Boulevard, Suite 1550, Los Angeles, California. 90010. Defy's mission is to use entrepreneurship and employment as tools for currently and formerly incarcerated individuals to address the social problems of mass incarceration and recidivism. Defy has chapters in New York, Northern California, Southern California, Connecticut, and Illinois, and licensed affiliates in Colorado and Washington.

22.     Defendant United States Small Business Administration is an independent federal agency created and authorized pursuant to 15 U.S.C. § 633, *et seq.* The SBA maintains a branch location at 100 S. Charles Street #1201, Baltimore, Maryland, 21201. Its headquarters are located at 409 3rd Street, SW, Washington, District of Columbia, 20416.

23.     Defendant Jovita Carranza (the "Administrator") is the Administrator of the SBA, a Cabinet-level position, and is sued in her official capacity. The SBA is

headquartered at 409 3rd Street, SW, Washington, District of Columbia, 20416. Authority to sue the Administrator is granted by 15 U.S.C. § 634(b).

24.     Defendant United States Department of the Treasury ("Treasury") is a department of the executive branch of the United States government headquartered at 1500 Pennsylvania Avenue, NW, Washington, District of Columbia, 20220.

25.     Defendant Steven Mnuchin (the "Secretary") is the Secretary of the United States Department of the Treasury and is sued in his official capacity. The Treasury is headquartered at 1500 Pennsylvania Avenue, NW, Washington, District of Columbia, 20220.

## JURISDICTION AND VENUE

26.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331. The Court has remedial authority pursuant to 28 U.S.C. § 1361, 28 U.S.C. § 2201, and 5 U.S.C. § 702.

27.     Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

### I.     Congress Enacts the Paycheck Protection Program.

28.     On March 13, 2020, President Trump declared the "ongoing Coronavirus Disease 2019 (COVID–19) pandemic is of sufficient severity and magnitude to

warrant an emergency determination" that "an emergency exists nationwide."[13]

29.     On March 27, 2020, Congress passed the CARES Act, allocating $2 trillion in assistance to individuals and businesses. The Act included direct Economic Impact Payments of up to $1,200 per American adult and $367 billion to assist small businesses through the SBA.[14]

30.     By late March 2020, small businesses were already "scrambling to make payroll, sort out which staff they can keep on—and which they can't—and figure out some way to keep money coming in."[15]

31.     Title I of the CARES Act is entitled "Keeping American Workers Paid and Employed Act." Pub. L. No. 116-136, 134 Stat. 281, 286 (2020).

32.     As part of Title I, Congress created the Paycheck Protection Program. *Id.* § 1102.

33.     Although PPP funds are distributed in the form of bank loans, the PPP more closely resembles an emergency grant program: The CARES Act provides that

---

[13] Letter from President Donald J. Trump on Emergency Determination Under the Stafford Act (Mar. 13, 2020), https://www.whitehouse.gov/briefings-statements/letter-president-donald-j-trump-emergency-determination-stafford-act.

[14] The initial tranche of PPP funding was almost immediately exhausted. Subsequently, on April 24, 2020, the President signed the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. No. 116–139, 134 Stat. 620 (2020)), which appropriated an additional $310 billion in funding. On June 5, 2020, Congress then passed the Paycheck Protection Program Flexibility Act of 2020 as an amendment to the CARES Act "to allow recipients of loan forgiveness under the paycheck protection program to defer payroll taxes, and for other purposes." Pub. L. No. 116-142, 134 Stat. 641. Neither piece of legislation altered the provision of the CARES Act that defines eligibility for the PPP.

[15] Kimberly Adams, *Despite Imminent Federal Aid, Small Businesses are Desperate*, MarketPlace (Mar. 27, 2020), https://www.marketplace.org/2020/03/27/will-covid19-stimulus-package-help-small-businesses/.

PPP funds will be guaranteed by the SBA and entirely forgiven to the extent that the money is used for certain purposes, including payroll costs, health care benefits, and insurance premiums. 15 U.S.C. § 636(a)(36)(A)(viii). Accordingly, so long as the business spends the funds for those purposes, the "loans" need not be repaid.

34.    The provision of the CARES Act that defines eligibility for the PPP is entitled "Increased eligibility for certain small businesses and organizations." *Id.* § 636(a)(36)(D).

35.    Under that heading, the text of the CARES Act unequivocally directs that "[d]uring the covered period, in addition to small business concerns, *any* business concern … *shall* be eligible to receive a covered loan if the business concern … employs not more than the greater of (I) 500 employees; or (II) if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern … operates." *Id.* § 636(a)(36)(D)(i) (emphasis added).[16]

36.    The application deadline for PPP funding is June 30, 2020.[17]

---

[16] Under the CARES Act, small business loans were also made available to "individuals who operate under a sole proprietorship or as an independent contractor and eligible self-employed individuals." *Id.* § 636(a)(36)(D)(ii).

[17] *See* U.S. Senate Committee on Small Business & Entrepreneurship, Paycheck Protection Program FAQs for Small Businesses, https://www.rubio.senate.gov/public/_cache/files/ac3081f6-14ae-4e6f-9197-172ede28badd/71AB6CB05A08E369E0D488A80B3874A5.faqs---paycheck-protection-program-faqs-for-small-businesses.pdf.("Applicants are eligible to apply for the PPP loan until June 30th, 2020."); *see also* Joint Statement by Treasury Secretary Steven T. Mnuchin and SBA Administrator Jovita Carranza Regarding Enactment of the Paycheck Protection Program Flexibility Act, U.S. Dep't of the Treasury (June 8, 2020) ("June 30, 2020 remains the last date on which a PPP loan application can be approved"); SBA, Business Loan Program Temporary Changes; Paycheck Protection Program – Additional Revisions to First Interim Final Rule, Docket No. SBA-2020-0036 (June 12, 2020), https://www.sba.gov/sites/default/files

## II.     The Small Business Administration Imposes Criminal-Record Exclusions on PPP Eligibility.

37.     The CARES Act provides that the PPP shall be administered by the SBA under Section 7(a) of the Small Business Act, *id.* § 636(a), and instructs the SBA to "issue regulations to carry out this title and the amendments made by this title without regard to the notice requirements under section 553(b) of title 5, United States Code" within 15 days. Pub. L. No. 116-136, § 1114, 134 Stat. at 312 ("Emergency Rulemaking Authority").

38.     Since the enactment of the CARES Act, the SBA has issued a series of confusing, contradictory, and continuously shifting eligibility criteria for the PPP far exceeding those exclusive conditions Congress enumerated in the CARES Act.

39.     On March 31, 2020, the SBA released a sample application form for PPP funding ("March application form"), which included questions regarding criminal history, to be answered by small-business owners with greater than 20% ownership stakes. The March application form instructed that a "Yes" answer to either of the following questions would mean that the "loan will not be approved":

> Question 5: Are you presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, on probation or parole?
>
> Question 6: Within the last *7 years*, for any felony *or misdemeanor* for a crime against a minor, have you: 1) been convicted; 2) pleaded guilty; 3) pleaded nolo contendere; 4) been placed on pretrial diversion; or 5) been

---

/2020-06/PPP-IFR-Revisions-to-First-Interim-Final-Rule_06%2012%2020.pdf (discussing expiration of SBA's authority to guarantee loans).

placed on any form of parole or probation (including probation before judgment)?[18]

40.    Notably, the March application form disqualified applicants who had been placed on probation or parole within the last seven years but who had been subsequently discharged.

41.    On April 2, 2020, the SBA posted on its website an Interim Final Rule for the PPP. This Interim Final Rule ("April IFR") was published in the Federal Register on April 15, to "implement the CARES Act." 85 Fed. Reg. 20,811 (Apr. 15, 2020) ("Business Loan Program Temporary Changes; Paycheck Protection Program").[19]  The April IFR explained that the CARES Act and PPP are designed to

---

[18] *See* SBA, Paycheck Protection Program Application Form, SBA Form 2483 (03/20), OMB Control No.: 3245-0407 (Expiration Date: 09/30/2020), https://www. sba.gov/sites/default/files/2020-03/Borrower%20Paycheck%20Protection%20 Program%20Application_0.pdf (emphasis added).

[19] SBA has also issued several additional interim final rules on other aspects of the PPP not at issue in this case. *See* 85 Fed. Reg. 20,817, 20,817 (Apr. 15, 2020) ("supplements the Initial Rule with additional guidance regarding the application of certain affiliate rules"); 85 Fed. Reg. 21,747 (Apr. 20, 2020) ("Additional Eligibility Criteria and Requirements for Certain Pledges of Loans"); 85 Fed. Reg. 23,450 (Apr. 28, 2020) ("Requirements-Promissory Notes, Authorizations, Affiliation, and Eligibility"); 85 Fed. Reg. 23,917 (Apr. 30, 2020) ("Additional Criterion for Seasonal Employers"); 85 Fed. Reg. 26,321 (May 4, 2020) ("Requirements-Disbursements"); 85 Fed. Reg. 26,324 (May 4, 2020) ("Paycheck Protection Program-Requirements-Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders"); 85 Fed. Reg. 27,287 (May 8, 2020) ("Nondiscrimination and Additional Eligibility Criteria"); 85 Fed. Reg. 29,845 (May 19, 2020) ("Extension of Limited Safe Harbor With Respect to Certification Concerning Need for PPP Loan Request"); 85 Fed. Reg. 29,842 (May 19, 2020) ("Paycheck Protection Program-Loan Increases"); 85 Fed. Reg. 29,847 (May 19, 2020) ("Eligibility of Certain Electric Cooperatives"); 85 Fed. Reg. 30,835 (May 21, 2020) ("Treatment of Entities With Foreign Affiliates"); 85 Fed. Reg. 31,357 (May 26, 2020) ("Second Extension of Limited Safe Harbor With Respect to Certification Concerning Need for PPP Loan and Lender Reporting"); 85 Fed. Reg. 33,004 (June 1, 2020) ("Requirements—Loan Forgiveness"), 85 Fed. Reg. 33,010 (June 1, 2020) ("SBA Loan Review Procedures

"provide immediate assistance to individuals, families, and businesses affected by the COVID-19 emergency" and instructed that "[l]enders must comply with the applicable lender obligations set forth" in the IFR. *Id.* at 20,811-12.

42.     The April IFR included the following exclusion:

Could I be ineligible even if I meet the eligibility requirements in (a) above? You are ineligible for a PPP loan if, for example:

…

iii. An owner of 20 percent or more of the equity of the applicant is incarcerated, on probation, on parole; presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction; or has been convicted of a felony within the last five years;[20]

43.     The April IFR contradicted the March application form, imposing a five-year felony ban instead of a seven-year felony or misdemeanor ban.

44.     The April IFR also claimed that "[b]usinesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and described further in SBA's Standard Operating Procedure (SOP) 50 10, Subpart B, Chapter 2," referencing an earlier SBA rule and interpreting document that specified businesses ineligible to receive loans under a different SBA loan program. *Id.*[21] However, those rules nowhere contain the felony ban imposed by the April IFR.

---

and Related Borrower and Lender Responsibilities"); 85 Fed. Reg. 35550 (June 11, 2020) ("eligibility requirements for certain telephone cooperatives").

[20] 85 Fed. Reg. at 20812.

[21] That earlier rule excluded "Businesses with an Associate who is incarcerated, on probation, on parole, or has been indicted for a felony or a crime of moral turpitude." *See* 13 C.F.R. § 120.110(n). Pursuant to SBA guidance on that rule, applicants with

45.     On April 3, 2020, the same day that the PPP opened for applications,[22] the SBA published a new PPP borrower application form ("April application form"). The April application form asked two questions regarding criminal history, with a "Yes" answer to either one resulting in disqualification:

> Question: Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on probation or parole?

> Question: Within the last 5 years, for any felony, has the Applicant (if an individual) or *any owner* of the Applicant 1) been convicted; 2) pleaded guilty; 3) pleaded nolo contendere; 4) been placed on pretrial diversion; or 5) been placed on any form of parole or probation (including probation before judgment)?[23]

---

"a deferred prosecution, conditional discharge, order of protection, or on a sex offender registry" were "treated as if the individual is on probation or parole," and applicants were also excluded if they were "currently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction." (SOP) 50 10, Subpart B, Chapter 2, at 292-293, https://www.sba.gov/sites/default/files/2019-02/SOP%2050%2010%205%28K%29%20FINAL%202.15.19%20SECURED%20copy%20paste.pdf.

[22] *See* Christopher Zara, *Paycheck Protection Program: What Small Businesses Need to Know as SBA Loan Applications go Live*, Fast Company (Apr. 3, 2020).

[23] SBA, Paycheck Protection Program, Borrower Application Form, SBA Form 2483 (04/20) OMB Control No.: 3245-0407 (Expiration Date: 09/30/2020), https://www.sba.gov/sites/default/files/2020-04/PPP%20Borrower%20Application%20Form.pdf (emphasis added).

46.     This "snapshot" comes from the April application form:

*If questions (5) or (6) are answered "Yes," the loan will not be approved.*

| Question | Yes | No |
|---|---|---|
| 5.   Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on probation or parole? | ☐ | ☐ |
| Initial here to confirm your response to question 5 →  _____ | | |
| 6.   Within the last 5 years, for any felony, has the Applicant (if an individual) or any owner of the Applicant 1) been convicted; 2) pleaded guilty; 3) pleaded nolo contendere; 4) been placed on pretrial diversion; or 5) been placed on any form of parole or probation (including probation before judgment)? | ☐ | ☐ |
| Initial here to confirm your response to question 6 →  _____ | | |

47.     The April application form conflicted with the April IFR. The April application form described the grounds for criminal history-based disqualification even more broadly than the April IFR.

48.     For example, the April application form disqualified anyone who has been *discharged* from probation or parole but was previously placed on probation or parole in the last five years.

49.     The April application form also disqualified people who have "pleaded nolo contendere," or who have been "placed on pretrial diversion" or "placed on … probation before judgment," despite the fact that these pleas are entered into without formal test of the validity of the underlying charge, and despite the fact that the very purpose of accepting these dispositions is to *avoid* the consequences of a criminal record.

50.     In response to the April IFR and April application form, members of Congress pointed out that the criminal-record exclusions contravene the CARES Act. Lawmakers questioned the SBA's authority to bar business owners with records from PPP relief under the Act, and several asked Defendants to explain the exclusions.

14

51.     On April 6, 2020, Representative Cedric L. Richmond and ten other members of Congress submitted a letter to Secretary Mnuchin and Administrator Carranza pointing out that "[t]he [criminal-record exclusions] contain[] many restrictions that were not only not included in the CARES Act" but "not intended by Congress at all. Specifically, Congress did not intend for people who have been released from prison and followed the law to start or help start a business to be prevented from getting the capital they need to save it." Exhibit E.

52.     On April 8, Senator Jeffrey A. Merkley submitted a letter to Secretary Mnuchin and Administrator Carranza calling "the breadth of [the criminal-record exclusions] unconscionable, as it punishes individuals who should be innocent until proven guilty and those who have already served their time and, due to the well-known racial disparities in our justice system, disproportionately disqualifies minority-owned businesses." Exhibit F.

53.     On April 30, Senators Rob Portman and Benjamin L. Cardin submitted a letter to Secretary Mnuchin and Administrator Carranza asking the SBA to revise its criminal-record exclusions "so that it properly reflects Congress and the Administration's support for second chances" and noting that the criminal-record exclusions "will only hurt the economy, and further diminish the workforce and the tax base they generate." Exhibit G. Senators Portman and Cardin stated that the PPP "was not intended to exclude business owner[s] who have made mistakes, paid their debt, and turned their lives around. Rather, it was intended to provide a bridge to hard-working American small-business owners who are keeping people employed

15

and supporting the essential services that benefit all of us during this unprecedented crisis." *Id.*

54.     On May 19, Representative Dina Titus and sixteen other members of Congress submitted a letter to the Administrator asserting that "the SBA has failed to provide any sort of reasoning for requiring applicants to indicate whether they have any history of a criminal offense other than a minor vehicle violation." Exhibit H. The letter demanded that the SBA "issue specific guidance on how criminal history is being used in the distribution of congressionally appropriated assistance." *Id.* Representative Titus's letter further stated that "[d]enying assistance to rehabilitated citizens who have served their sentences and contributed to the economy is unjust and harmful to our nation's recovery from this pandemic." *Id.*

55.     Advocates across the country and political spectrum also voiced opposition to the SBA's actions. On April 20, 2020, Right on Crime—a "national campaign to promote successful, conservative solutions on American criminal justice policy"[24]—and eight other groups submitted a letter to Defendants asking the administration to "tailor the Final Interim Rule to reflect common-sense." Exhibit I. The Council of State Governments Justice Center and a dozen other groups issued a joint statement noting that "The Small Business Administration's policies regarding people with criminal records go against the intent of the legislation and the Trump

---

[24] *The Conservative Approach To Criminal Justice*, Right on Crime (last visited June 15, 2020), http://rightoncrime.com.

administration's ongoing support of second chances for people who have served their time." Exhibit J.

56.     During the notice-and-comment period, numerous organizations submitted letters questioning both the legality and the logic of the restrictions. *See, e.g.*, Citizens for Juvenile Justice et al., Re: U.S. Small Business Administration Business Loan Program; Paycheck Protection Program Interim Final Rule, No. SBA-2020-0015, RIN 3245-AH34 (May 15, 2020) ("To exclude a class of business owners or partial owners from the Paycheck Protection simply on the basis of their past involvement with the criminal justice system or unadjudicated allegations concerning their present involvement is not only contrary to law, it is wrong.") (Exhibit K); Collateral Consequences Resource Center et al., Re: U.S. Small Business Administration Business Loan Program; Paycheck Protection Program Interim Final Rule, No. SBA-2020-0015, RIN 3245-AH34 (May 15, 2020) ("SBA's new restrictions on eligibility for its loan programs, which already operate to exclude many people with a record, contravene the intent of the CARES Act, and are inconsistent with SBA's more general mandate of encouraging entrepreneurship and expanding access to employment.") (Exhibit L); Institute for Justice Clinic on Entrepreneurship, Re: U.S. Small Business Administration Business Loan Program; Paycheck Protection Program Interim Final Rule, No. SBA-2020-0015, RIN 3245-AH34 (May 15, 2020) ("the SBA's Interim Final Rule arbitrarily cuts some American businesses off from emergency funding, leaving them to fail despite their importance to the economy. The Rule thwarts the intent and text of the PPP….") (Exhibit M).

57.     On June 11, 2020, the SBA issued yet another revised PPP application form, the "Paycheck Protection Program Borrower Application Form Revised June 2020," SBA Form 2483 (06/20), OMB Control No.: 3245-0407 (Expiration Date: 10/31/2020), https://home.treasury.gov/system/files/136/PPP-Borrower-Application-Form-Revised-June-2020.pdf?utm_medium=email&utm_source=govdelivery ("June 11 application form"). The June 11 application form deleted the exclusion of businesses with an owner who has been placed on pretrial diversion for any felony within the last five years, but it left the remaining exclusions intact.

58.     On the afternoon of Friday, June 12, 2020—days before the PPP's June 30 application deadline—the SBA announced a new Interim Final Rule on its website. *See* SBA, Business Loan Program Temporary Changes; Paycheck Protection Program – Additional Revisions to First Interim Final Rule, Docket No. SBA-2020-0036, at 5 (June 12, 2020), https://www.sba.gov/sites/default/files/2020-06/PPP-IFR-Revisions-to-First-Interim-Final-Rule_06%2012%2020.pdf ("June IFR") (Exhibit N).

59.     The June IFR again modified this exclusion:

> You are ineligible for a PPP loan if, for example:
> * * *
> iii. An owner of 20 percent or more of the equity of the applicant is incarcerated, on probation, on parole; presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction; or has been convicted of a felony involving fraud, bribery, embezzlement, or a false statement in a loan application or an application for federal financial assistance within the last five years or any other felony within the last year;

60.     The June IFR left the remaining exclusions intact.

18

61.     Although the SBA never explained the basis for its felony exclusion in the first place, it now stated that "[a]fter further consideration, the Administrator, in consultation with the Secretary of the Treasury (the Secretary), has determined that a shorter timeframe for felonies that do not involve fraud, bribery, embezzlement, or a false statement in a loan application or an application for federal financial assistance *is more consistent with Congressional intent* to provide relief to small businesses and also promotes the important policies underlying the First Step Act of 2018 (Pub. L. 115-391)." June IFR at 5 (emphasis added).

62.     That same day, the SBA also published another new "Paycheck Protection Program Borrower Application Form," OMB Control No.: 3245-0407 (Expiration Date: 10/31/2020) ("June 12 application form") (Exhibit O). The following is a "snapshot" of the relevant questions on the June application form:

| *If questions (5) or (6) are answered "Yes," the loan will not be approved.* | | |
|---|---|---|
| **Question** | **Yes** | **No** |
| 5.  Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on probation or parole?<br>Initial here to confirm your response to question 5 → _____ | ☐ | ☐ |
| 6.  Within the last 5 years, for any felony involving fraud, bribery, embezzlement, or a false statement in a loan application or an application for federal financial assistance, or within the last year, for any other felony, has the Applicant (if an individual) or any owner of the Applicant 1) been convicted; 2) pleaded guilty; 3) pleaded nolo contendere; or 4) been placed on any form of parole or probation (including probation before judgment)?<br>Initial here to confirm your response to question 6 → _____ | ☐ | ☐ |

63.     The June 12 application form left in place the exclusions imposed by the April application form regarding nolo contendere and probation before judgment records, despite the fact that those exclusions appeared nowhere in either the April IFR or the June IFR.

64.     The June IFR stated that it will not be effective until its "date of filing at the office of the federal register." June IFR at 1 (original capitalization omitted).

65.     In these unprecedented times, the SBA has taken Congress's straightforward mandate to administer the PPP to sustain small businesses—and the workers they employ—and added unnecessary, confusing, inconsistent, unexplained, and shifting exclusions of small-business owners who have had contact with the criminal-legal system.

66.     To date, Defendants have not explained the basis or logic of the criminal-record exclusions, despite repeated requests to do so—including by members of Congress.

67.     To date, Defendants have not identified any nexus between applicants' criminal history and the reason for their disqualification from PPP funds.

68.     Because they are contrary to the plain text of the CARES Act and are arbitrary and capricious, the criminal-record exclusions violate the APA. They also cause irreparable harm to otherwise eligible applicants whose businesses have been impacted by COVID-19, illegally barring them from critical federal aid. The criminal-record exclusions likewise harm the employees of those businesses and the organizations who devote resources to funding and advising them.

### III.    The Criminal-Record Exclusions Harm Plaintiffs.

#### a.  Sekwan Merritt and Lightning Electric.

69.     Sekwan Merritt owns Lightning Electric, an electrical contracting company licensed to provide electrical wiring services in seven Maryland counties.

70.     Mr. Merritt is also a restorative justice advocate. In 2017, he testified on Capitol Hill regarding the Pretrial Integrity and Safety Act.[25] He discussed how the jail and cash bail system impacts people of color, and how facilities can increase rehabilitative resources to stop the revolving door of local jails. Mr. Merritt has spoken before the Baltimore City Council and at universities on topics related to the criminal-legal system.

71.     Mr. Merritt returned home from prison in 2017 and is currently on parole. He pleaded guilty to non-violent drug offenses in 2012. During his five years in prison, he enrolled in an education partnership run by a local Maryland college, and he earned 40 credits toward his Bachelor's degree.[26] He also continued to learn about electrical work. He created business plans for starting his own company.

72.     Mr. Merritt founded his company in October 2017. Lightning Electric serves both residential and commercial clients, providing installation of low and high-voltage electrical wiring.

73.     Mr. Merritt has used Lightning Electric to create economic opportunities for members of his community who are facing barriers to employment. Of the five contracted electricians who work for Lightning Electric, four are formerly incarcerated individuals. Mr. Merritt provides his workers with opportunities to

---

[25] Shoshana Weissmann, *Locked Up Without Conviction: Pretrial Integrity and Safety Act, Strategies for Public Safety*, R Street (Nov. 5, 2017), https://www.rstreet.org/2017/11/05/locked-up-without-conviction-pretrial-integrity-and-safety-act-strategies-for-public-safety/.

[26] Danielle Douglas-Gabriel, *12,000 Inmates to Receive Pell Grants to Take College Classes*, Wash. Post (June 24, 2016), https://www.washingtonpost.com/news/grade-point/wp/2016/06/24/12000-inmates-to-receive-pell-grants-to-take-college-classes/.

learn about every aspect of the contracting business, including estimating costs for projects and material logistics. His goal is that his workers learn the skills they need to become entrepreneurs in their own right.

74.     Mr. Merritt is proud of his success as a business owner in the electrical contracting field. He hopes to provide electrical contracting in underserved communities, to set an example for the next generation of minority contractors and, in particular, to provide opportunity and hope for incarcerated individuals and those returning home from prison.

75.     On March 5, 2020, Maryland Governor Larry Hogan declared a state of emergency in response to the novel coronavirus.[27] On March 23, Governor Hogan issued an order closing all non-essential business in the state.[28] On March 30, he issued a stay-at-home order and directed Marylanders to leave their homes only for an essential reason.

76.     Businesses across the state closed their doors, and unemployment claims spiked to record highs as Marylanders lost their jobs. By May 28, more than 660,000 people in Maryland had filed for unemployment. The state's unemployment rate soared to 9.9%.[29]

---

[27] Maryland, Proclamation: *Declaration of State of Emergency of Catastrophic Health Emergency - COVID-19* (Mar. 5, 2020), https://governor.maryland.gov/wp-content/uploads/2020/03/Proclamation-COVID-19.pdf.

[28] Maryland, Order No. 20-03-23-01 (Mar. 23, 2020), https://governor.maryland.gov/wp-content/uploads/2020/03/Gatherings-THIRD-AMENDED-3.23.20.pdf.

[29] Jessica Iannetta, *New Md. Unemployment Claims Hold Steady After Weeks of Dramatic Swings*, Balt. Bus. J. (May 28, 2020), https://www.bizjournals.com/baltimore/news/2020/05/28/maryland-unemployment-claims-pandemic-hold-

77.     Lightning Electric was forced to shut down operations almost completely in March as a result of the coronavirus and Governor Hogan's orders. During the time that the stay-at-home order was in place, Mr. Merritt was unable to pay the electricians working for Lightning Electric. While the company received jobs from customers intermittently, the work coming in was not nearly enough to keep all of Lightning Electric's workers busy at their pre-coronavirus capacity.

78.     Mr. Merritt applied for PPP funds on April 15, 2020. He used the online portal of his bank, Wells Fargo, to fill out the application, which tracked the SBA's mandated language.

79.     Specifically, the application form contained two questions regarding criminal history. The first asked:

> Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on probation, or parole?

80.     The second question asked:

> Within the last five years, for any felony, has the Applicant (if an individual) or any owner of the Applicant 1) been convicted; 2) pleaded guilty; 3) pleaded nolo contendere; 4) been placed on pretrial diversion; or 5) been placed on any form of parole or probation (including probation before judgment)?

81.     Because Mr. Merritt is on parole, he answered "yes" to both questions.

---

steady.html#:~:text=Since%20the%20pandemic%20began%2C%20more,the%20stat
e%20lost%20349%2C300%20jobs.

82.     Immediately upon submission of the application, a screen popped up stating: "Based on the answers provided, your application cannot be processed at this time."

83.     Had Mr. Merritt received the PPP funding he sought, he intended to use it to pay Lightning Electric's workers when the company's operations were almost fully shut and the electricians unable to work. He also would have used it to pay the costs essential for running his business, including general liability insurance, which Lightning Electric is required to maintain to be eligible for certain types of contracts.

84.     While Maryland has recently begun to open in stages, and Lightning Electric has some more work slowly coming in, the company's finances remain highly precarious. The two contracts that Lightning Electric secured in early 2020 will proceed, but on a much longer timeframe due to strict restrictions on how many people can be present at the job sites at one time. As a result, Lightning Electric must wait longer to get paid.

85.     Despite the significant decrease in work, Lightning Electric continues to have approximately $9,000 in biweekly payroll expenses. Mr. Merritt desperately wants to keep all the electricians on his payroll, because his workers are important to him. Maintaining the company's team of electricians is critical to the business's ongoing survival because it allows the company to preserve its reputation and customer relationships.

86.     Lightning Electric also has other overhead expenses, including insurance and advertising costs.

87.     Mr. Merritt has been pouring his own savings, as well as money from his family, into Lightning Electric to keep it afloat. He estimates that, in the past months, he has cobbled together approximately $30,000 in savings and small familial gifts and loans to help the company survive in the short term.

88.     Mr. Merritt is constantly worried about funding for his company and is in dire need of financial assistance. Without an influx of cash, there is a substantial risk that Lightning Electric might not survive this time of intense economic distress.

### b.  John D. Garland and Fastsigns Bethpage.

89.     John D. Garland is the owner and President of Fastsigns Bethpage, a franchise of Fastsigns Inc., a company providing sign, business card, letter, and other graphic design services for commercial and residential uses. Fastsigns Bethpage employs three people, including Mr. Garland, as full-time, salaried employees.

90.     Mr. Garland has spent over thirteen years building his graphic design business, which he first started in 2007 from a small shop in Bronx, New York.

91.     Mr. Garland was incarcerated from 1987 to 2003. While incarcerated, he learned graphic design and commercial printing.

92.     Mr. Garland had difficulty obtaining employment after his 2003 release. As a result, he decided to start his own business for graphic design and printing, called ClixClix Media Group, LLC.

93.     In 2018, Mr. Garland entered into business with Sign Me Up, Inc., a sign-making and graphic design company. He became the majority owner of a Sign Me Up location in Bethpage, New York, and the Vice President and 15% owner of a

Sign Me Up location in West Babylon, New York. In 2019, Fastsigns International, Inc. acquired Sign Me Up, and the Bethpage and West Babylon Sign Me Up locations became Fastsigns locations.

94.     Mr. Garland is committed to assisting people who, like him, have had difficult upbringings and experience with the criminal-legal system. In 2019, he started a partnership with the United Way to train and eventually employ thirteen young people from troubled backgrounds. Mr. Garland intends to expand the program to the formerly incarcerated and veterans. He also partners with New York State in a program to assist youths with autism.

95.     Mr. Garland contributes to the Bethpage community, as well, including by donating signs to local schools for their graduations and providing masks to senior citizens during the COVID-19 pandemic.

96.     In October 2019, after a domestic argument with his wife, Mr. Garland was charged with a domestic violence offense. He denied all of the allegations, and in December 2019, the case was adjourned in contemplation of dismissal, with a limited order of protection remaining entered against him.

97.     In December 2019, Mr. Garland was charged with petit larceny, after his wife alleged that he had moved her personal property from one location to another in their home. Mr. Garland was also charged with a violation of the order of protection as a result of this offense. In February 2020, Mr. Garland appeared in court and pleaded not guilty. The case was adjourned for him to locate legal counsel. In the

meantime, the New York State courts closed a result of COVID-19, and thus the unproven charges against Mr. Garland remain pending.

98.    On March 7, 2020, New York Governor Andrew Cuomo declared a state of emergency in response to the coronavirus. On March 20, Governor Cuomo issued an order closing all non-essential businesses in the state and prohibited all non-essential gatherings of individuals of any size, effective March 22.

99.    Businesses across the state closed their doors, and, as in Maryland, unemployment claims in New York spiked to record highs. Between mid-March and June 2020, over 2.6 million New Yorkers filed for unemployment, and the unemployment rate soared to 14.5%.[30]

100.    Fastsigns Bethpage was shut down initially. It then reopened as an "essential business." Prior to the pandemic, Fastsigns Bethpage primarily engaged other businesses as clients. With so many businesses closed, Fastsigns Bethpage's revenue thus dropped dramatically. Mr. Garland has been unable to pay his employees, and he has fallen behind on his rent and utility bills.

101.    On April 10, 2020, Mr. Garland and his business partner began filling out an application for PPP funding. Mr. Garland then saw Question No. 5 on the form, excerpted in paragraph 46 above, and the statement immediately above those questions, which read: "If questions (5) or (6) are answered 'Yes,' the loan will not be approved." Mr. Garland did not complete the application due to the pending charge

---

[30] Michelle Breidenbach, *New NYS Unemployment Claims Reach 2.6M Since March*, Syracuse (June 11, 2020), https://www.syracuse.com/coronavirus/2020/06/new-nys-unemployment-claims-reach-26m-since-march.html.

against him. He followed up with his bank, Chase, to confirm that he was ineligible. Chase confirmed that Mr. Garland was excluded from the PPP under the SBA's directives based on his pending charge.

102.   Mr. Garland and his business partners had carefully determined the intended uses to which they would put the $100,000 in PPP funding they sought. They planned to use the funds for payroll costs, rent, utilities, and other essential expenses.

103.   New York is presently in the early stages of re-opening, but Fastsigns Bethpage's commercial business remains slow to non-existent. Mr. Garland has worked diligently to keep the business afloat, including by pivoting his business to serve individual customers and residences (instead of other businesses), for example by printing and selling graduation lawn signs. But, still without assistance from the PPP, Fastsigns Bethpage is thousands of dollars behind on rent and utilities, and Mr. Garland has been unable to take a paycheck for some time.

104.   Based on its growing rent arrears and limited income, there is a real risk that Fastsigns Bethpage will not survive the economic crisis brought about by the COVID-19 pandemic.

### c.  Defy Ventures, Inc.

105.   Defy Ventures, Inc. ("Defy") is a nonprofit organization founded in 2010 with chapters in the New York Tri-State area (New York, New Jersey, Connecticut), Northern California, Southern California, and Illinois. Defy also has licensed affiliates in Colorado and Washington.

106.   Defy's mission is to use entrepreneurship and employment as tools for currently and formerly incarcerated individuals to address the social problems of mass incarceration and recidivism. Defy's ultimate goal is for its members and graduates to achieve economic independence so that they may have a successful reentry after prison. Defy believes that individuals returning home from prison deserve a true second chance, or, in many cases, a "legitimate first chance," and that an arrest or conviction record should not be a lifetime punishment.

107.   To carry out its mission, Defy has established training programs both inside and outside of prisons. These programs include "the CEO of Your New Life" ("CEO YNL") for individuals who are currently in prison or transitional facilities, as well as "Entrepreneur Bootcamp" for individuals who have returned home from prison and have stable housing. Both programs include six to eight months of coursework focused on reentry planning, employment readiness, personal development, and entrepreneurship.

108.   CEO YNL is delivered through textbooks, DVDs, in-person instruction and facilitated discussion groups. Volunteers—many from the business community— support the enrolled "entrepreneurs-in-training" through in-person coaching events. Entrepreneur Bootcamp is an entry point to Defy's entrepreneurship pathway for those who did not complete CEO YNL while incarcerated. It is offered through self-directed online courses.

109.   Graduates of CEO YNL or Entrepreneur Bootcamp are eligible to apply to Defy's "Business Incubator" program. This program includes advanced coursework

in entrepreneurship and business management. Defy also provides training on the process of incorporating, launching, and growing new businesses.

110.   It typically takes entrepreneurs-in-training six to eighteen months to launch a business. Defy works with these individuals for the entire period.

111.   Defy also runs alumni programs and keeps in touch with its graduates. The "Defy Entrepreneurship Network" is a long-term supportive network for entrepreneurs who have successfully launched businesses. Members of this network are invited to quarterly networking meetings or business workshops; are paired with an executive mentor to support their business, if they desire; and have the opportunity to be featured on the Defy website or newsletter.

112.   In its ten years of operation, Defy has helped formerly incarcerated individuals launch over 140 small businesses. It has worked with over 5,200 entrepreneurs-in-training. The vast majority of Defy's entrepreneurs-in-training have been people of color, reflective of the prison population in the United States.

113.   Defy has proven results. Based on Defy's analysis, compared to a nationwide one-year recidivism rate of approximately 30%, the recidivism rate of Defy's graduates is less than 8%.

114.   The criminal-record exclusions have frustrated Defy's mission and hindered its operations.

115.   Like businesses across the country, small businesses run by Defy graduates have been experiencing severe economic distress from the COVID-related shutdowns.

116.    When they learned about the PPP's exclusion of individuals with arrest and conviction records, small-business-owner graduates of Defy's programs, as well as small-business owners who are not Defy graduates, sought advice and help from Defy.

117.    These individuals were in dire circumstances. Due to lack of funds, their businesses were forced to lay off workers, go into arrears, and, in some cases, shut down. Defy graduates typically own businesses operating in the service industry, because these require less start-up capital. These businesses, like the service industry at large, were especially hard-hit by COVID-19.

118.    The criminal-record exclusions imperil those who seek Defy's help and frustrate Defy's mission. Defy's organizing purpose is to use entrepreneurship and employment tools to provide economic security and successful reentry for formerly incarcerated individuals, and to help formerly incarcerated individuals have a real second chance.

119.    The criminal-record exclusions made it necessary for Defy to take action to try to help its graduates save their businesses and continue to pay their workers during the crisis.

120.    President and CEO of Defy, Andrew Glazier, together with Defy's staff, devoted their limited resources to understanding the SBA's changing rules and application forms, so that they could provide advice. They found Questions 5 and 6 on the PPP application form to be highly confusing and unclear. But Defy staff know that the stakes for providing the correct advice are high: an inadvertently incorrect

answer could potentially amount to a violation of the terms of probation or parole, or expose Defy's graduates to other liability. As a result, Defy staff poured hours into trying to parse the SBA's conflicting and confusing directives.

121.   As the SBA changed its regulations and application forms, Defy's graduates became even more confused about whether they might be eligible for PPP funds. Defy staff needed to expend yet more time and resources to understand these conflicting rules and to try to provide answers to those in need who have continued to turn to Defy for advice.

122.   Defy staff, including the CEO, the CFO, and the Director of Development and Marketing, have also had to spend their time, energy, and limited resources finding alternative funding sources for graduates' businesses, because they were wrongfully excluded from the PPP. Defy's work in this regard has included reaching out to community lenders, exploring the option of creating a separate fund for Defy graduates, working with graduates to start and publicize GoFundMe pages, and researching other funding resources.

123.   The PPP criminal-record exclusions have thus caused a significant diversion of Defy's resources. Had the SBA not excluded its graduates, Defy would have instead devoted this time and energy to its previously planned programming and training activities.

124.   Plaintiffs continue to suffer under the SBA's unlawful and ever-changing criminal-record exclusions.

## CAUSES OF ACTION

### COUNT I
### Administrative Procedure Act
### The Criminal-Record Exclusions Exceed Statutory Authority and
### Are Not in Accordance with Law
### (5 U.S.C. § 706(2)(A), (C))

125.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

126.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

127.    The criminal-record exclusions constitute final agency action subject to review under the APA.

128.    The SBA exceeded its statutory authority, and acted not in accordance with law, in violation of the APA, by promulgating the criminal-record exclusions. These exclusions add eligibility requirements for PPP funds based on a business owner's criminal record. These eligibility conditions are contrary to the CARES Act. Congress mandated that "any" business that satisfies the criteria Congress specified "shall" be eligible, not merely a subset of those businesses.

129.    Defendants' violation of the APA causes ongoing and irreparable harm to Plaintiffs and similarly situated business owners, businesses, and the organizations who devote resources to funding and advising them.

130.    Plaintiffs have no adequate remedy at law.

**COUNT II**
**Administrative Procedure Act**
**The Criminal-Record Exclusions are Arbitrary, Capricious,**
**and an Abuse of Discretion**
**(5 U.S.C. § 706(2)(A))**

131.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

132.   The APA instructs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, [and] an abuse of discretion." 5 U.S.C. § 706(2)(A).

133.   The criminal-record exclusions constitute final agency action subject to review under the Administrative Procedure Act.

134.   The criminal-record exclusions preventing business owners with criminal records from accessing PPP funds are arbitrary, capricious, and an abuse of discretion because they are contrary to the purpose of the CARES Act, which is to provide emergency support to American workers facing loss of income.

135.   Defendants failed to furnish any explanation for the criminal-record exclusions and failed to explain the inconsistencies between differing, inconsistent versions of these exclusions.

136.   Defendants' violation of the APA causes ongoing and irreparable harm to Plaintiffs and similarly situated business owners, and to those who work for them and devote resources to advising them.

137.   Plaintiffs have no adequate remedy at law.

## COUNT III
### Administrative Procedure Act
### The Criminal-Record Exclusions Were Adopted without
### Observance of Procedure Required by Law
### (5 U.S.C. § 706(2)(D))

138.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

139.   Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

140.   In issuing substantive rules, federal agencies are required to follow the notice and comment process set forth in the APA, 5 U.S.C. § 553(b).

141.   Although the SBA is authorized to "dispense with the 30-day delayed effective date provided in the Administrative Procedure Act" and issue rules without "*advance* notice and public comment," 85 Fed. Reg. at 20,811 (emphasis added), the agency may not dispense with the notice and comment process entirely; interim final rules must be published in the Federal Register to give the public notice and a chance to comment even when the rule may go into effect contemporaneously.

142.   The official application forms for PPP funds issued by the SBA exclude categories of business owners from applying beyond the categories of business owners who were identified in the April and June IFRs.

143.   By changing who was eligible for PPP funds by application form, and without providing notice or the opportunity to comment through publication in the

federal register, Defendants issued substantive rules not in accordance with procedures required by law.

144.   Defendants' violation of the APA causes ongoing and irreparable harm to Plaintiffs and similarly situated business owners, and to those who work for them and devote resources to advising them.

145.   Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully that this Court enter judgment in their favor and grant the following relief:

A.   Declare the criminal-record exclusions unlawful pursuant to 5 U.S.C. § 706(2);

B.   Preliminarily and permanently enjoin the SBA and the Treasury and its officers, employees, and agents from applying and enforcing the criminal-record exclusions contained in the SBA IFRs and application forms;

C.   Order the SBA to extend the PPP application deadline, which is currently set to close on June 30, 2020, by 21 days, to July 21, 2020, for those applicants unlawfully excluded under the challenged criminal-record exclusions;

D.   Order that the SBA Administrator and the Treasury Secretary not authorize, guaranty, or disburse funds appropriated for loans under the PPP without reserving sufficient funds to cover applicants wrongfully excluded under the challenged terms of the IFR and the application form, in an amount to be determined based on SBA data and submitted by the SBA to this Court for approval;

E.      Vacate and set aside Part III.2.b.iii. of the April Interim Final Rule (85

Fed. Reg. at 20,811, 20,812, as modified by the *Business Loan Program Temporary*

*Changes; Paycheck Protection Program – Additional Revisions to First Interim Final*

*Rule* Docket No. SBA-2020-0036 (June 12, 2020));

F.      Enter such other declaratory and/or injunctive relief as Plaintiffs may

specifically request hereafter;

G.      Award Plaintiffs their reasonable costs, litigation expenses, and

attorney's fees associated with this litigation; and

H.      Award any other relief the Court deems just and proper.


Dated:          June 16 , 2020                    Respectfully submitted,

                                                  */s/ Kali N. Bracey*

ReNika C. Moore (PHV pending)          Kali N. Bracey (Federal Bar No. 20752)
Alejandro A. Ortiz (PHV pending)       Elizabeth B. Deutsch (PHV pending)
Jennesa Calvo-Friedman (PHV            JENNER & BLOCK LLP
pending)                               1099 New York Avenue NW, Suite 900
AMERICAN CIVIL LIBERTIES UNION         Washington, DC 20001
FOUNDATION                             Tel.: (202) 639-6000
125 Broad St., 18th Floor              Fax: (202) 639-6066
New York, NY 10004                     KBracey@Jenner.com
Tel: (212) 549-2500                    EDeutsch@Jenner.com
Fax: (212) 549-2654
RMoore@ACLU.org                        Jacob D. Alderdice (PHV pending)
OrtizA@ACLU.org                        JENNER & BLOCK LLP
JCalvo-Friedman@ACLU.org               919 Third Avenue
                                       New York, NY 10022
Joanna K. Wasik (Federal Bar No.       Tel.: (212) 891-1625
21063)                                 Fax: (212) 891-1699
Hannah E. M. Lieberman (Federal Bar    JAlderdice@Jenner.com
No. 05456)
WASHINGTON LAWYERS' COMMITTEE FOR      Zachary D. Tripp (PHV pending)
CIVIL RIGHTS AND URBAN AFFAIRS         WEIL, GOTSHAL & MANGES LLP
700 14th St. NW, Ste 400               2001 M Street, NW, Suite 600
Washington, DC 20005                   Washington, DC 20036
Tel.: (202) 319-1000                   Tel.: (202) 682-7000

37

Fax: (202) 319-1010
Joanna_Wasik@washlaw.org
Hannah_Lieberman@washlaw.org

Claudia De Palma (PHV pending)
PUBLIC INTEREST LAW CENTER
1500 JFK Blvd., Suite 802
Philadelphia, PA 19102
Tel: (215) 627-7100
cdepalma@pubintlaw.org

Zack.Tripp@Weil.com

Robert B. Niles-Weed (PHV pending)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel.:(212) 310-8000
Robert.Niles-Weed@Weil.com